UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION

BP CARE, INC.

          Plaintiff,

      v.

TOMMY THOMPSON, SECRETARY OF
HEALTH AND HUMAN SERVICES, and

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, et al.

          Defendants.

Case No.  C-1-01-526

Hon. Susan J. Dlott,
District Court Judge

**SECRETARY'S RESPONSE TO MOTION FOR
STAY OF EXECUTION PENDING APPEAL**

Plaintiff BP Care[1] filed this judgment action to prevent Tommy G. Thompson, Secretary

of Health and Human Services, and the U.S. Department of Health and Human Services

(collectively, "the Secretary") from collecting a $35,650 civil monetary penalty (CMP).  On

September 26, 2003, this Court granted the Secretary's motion to dismiss because it lacked

subject matter jurisdiction over some claims and because the rest failed to state a claim upon

which relief may be granted.  See Fed. R. Civ. P. 12(b)(1),(6).  BP Care appealed and final

appellate briefs in BP Care, Inc. v. Thompson, No. 03-4365 (6th Cir.) have been filed.

Meanwhile, on January 23, 2004, the Centers for Medicare & Medicaid Services (CMS),

which oversees the Medicare and Medicaid programs on the Secretary's behalf, issued its second

request that BP Care repay the CMP (including accrued interest), and it set a February 11, 2004

---

[1] BP Care's rights and liabilities have been conveyed twice through statutory mergers
with related corporations owned by Roger King – most recently through a merger with Regal
Care Residences, Inc.  See Pet. Mot. for Stay, Ex. (1st King Aff.), at ¶¶ 1-2.  Except as needed to
discuss the provider's financial history, the Secretary will refer to it as "BP Care."

deadline for payment.  On February 10, 2004, BP Care moved for an injunction pending appeal

pursuant to Fed. R. Civ. P. 62(c).  BP Care attached two affidavits by Roger King, the owner and

sole shareholder of BP Care.  The premise of BP Care's motion is simple:  if the Secretary

recovers the CMP, BP Care will be "forced" to transfer the financial impact of the CMP to the

facility's direct care staff, and thereby harm its residents.  Pet. Mot. for Stay, Ex. (2nd King Aff.)

at 1 ¶ 3.  While Mr. King implies that BP Care has no other financial resources to pay the CMP,

the most current financial information submitted to Medicare clearly indicates otherwise.  The

equities weigh in the Secretary's favor.  The Secretary asks this Court deny BP Care's motion.

## I.    Statement of the Case

### A.    Procedural Posture

On March 11, 1999, the Secretary imposed a $35,650 CMP against a nursing home

owned and operated by Westchester Management d/b/a Barbara Parke Care Center, which

responded by requesting an administrative hearing.  Due to the pendency of this hearing request,

the CMP would not become due and payable until after a final administrative determination.

42 C.F.R. § 488.442(a)(1).  In July 1999, BP Care acquired the facility and accepted automatic

assignment of the Medicare provider agreement, as well as the concomitant benefits and burdens

thereof.  Westchester Management and BP Care became jointly and severally liable for the CMP.

After the change of ownership, Westchester Management continued to pursue the

administrative appeal.  On September 13, 1999, Westchester Management filed for bankruptcy;

thereafter, the Trustee in Bankruptcy participated in the administrative proceedings.  Despite

actual notice of the proceedings, BP Care did not attempt to participate.  Eventually, the Trustee

in Bankruptcy submitted a voluntarily dismissal, but only to the extent of the debtor's right to

hearing.  R19 Ex. 5, at 1.  On June 4, 2001, with no other party having ever appeared before the

N:\_ECF Workload\JHoltzman\BPDefRepStay.wpd

Administrative Law Judge (ALJ) during the preceding year and ten months to contest the CMP, the ALJ rendered a final determination by dismissing the entire case.

Instead of attempting to ask the ALJ reconsider the dismissal, BP Care instituted a collateral attack on the CMP in this Court. On August 3, 2001, it filed suit to enjoin collection of the CMP. While the suit remained pending, CMS notified BP Care on March 22, 2002 that the CMP had become due and payable. See HHS Ex. 1, at 1. CMS requested payment by April 11, 2002, or else it would begin to assess interest on the debt. Id. BP Care did not reimburse CMS, and interest started to accrue.

On September 26, 2003, this Court granted the Secretary's motion to dismiss. First, this Court dismissed some of BP Care's claims under Rule12(b)(1) for lack of jurisdiction. R24 at 7-10; see 42 U.S.C. § 1395i-3(h)(2)(B)(ii) (incorporating 42 U.S.C. § 1320a-7a(e)); 42 U.S.C. § 1395ii. This Court found that despite actual notice of the administrative proceedings, BP Care had failed to exhaust administrative remedies. This Court further noted that the U.S. Courts of Appeals retain exclusive jurisdiction over judicial review of from the Secretary's final administrative determinations regarding CMPs. R24, at 8; see 42 U.S.C. § 1395i-3(h)(2)(B)(ii) (incorporating 42 U.S.C. § 1320a-7a(e)).

Second, citing the deferential standard for Rule 12(b)(6), this Court also liberally construed the Complaint to allege claims disputing successor liability that existed "in isolation" from the administrative proceedings.[2]  Upon asserting jurisdiction pursuant to 28 U.S.C. § 1331

_____

[2] On appeal, the Secretary has asked the Sixth Circuit to affirm the dismissal of BP Care's entire action for failing to exhaust administrative remedies because all of the claims alleged in the Complaint were inextricably intertwined with matters at issue in the administrative proceedings. In the event that the Sixth Circuit approves of this Court's assertion of subject matter jurisdiction over claims attacking successor liability allegedly "in isolation" from the

(continued...)

N:\_ECF Workload\JHoltzman\BPDefRepStay.wpd

over these claims, this Court dismissed them under Rule 12(b)(6) in light of <u>Deerbrook Pavilion,</u>

<u>L.L.C. v. Shalala</u>, 235 F.3d 1100, 1103-05 (8th Cir. 2000).  R24 at 10-13.

After this Court entered judgment, BP Care appealed to the Sixth Circuit, which docketed

the matter as <u>BP Care, Inc. v. Thompson</u>, No. 03-4365 (6th Cir.).  The parties have fully briefed

the matter before the Sixth Circuit and await instructions regarding the scheduling of oral

argument.  After the opening briefs were filed, on January 23, 2004, CMS reiterated its prior

March 22, 2002 request for payment of the CMP.  Pet. Mot. for Stay, Ex. (Jan. 23, 2004 letter),

at 1.  The letter stated that by February 11, 2004, the total CMP, including accrued interest,

would amount to $40,748.62.  <u>Id.</u>  CMS further warned BP Care that if it did not pay the debt in

full by that date, CMS would collect the CMP without further notice by recovering it from sums

owed to the facility by the Medicare and Medicaid programs.  <u>Id.</u>

On February 10, 2004, BP Care filed a Motion for Stay of Execution Pending Appeal, in

which it claimed that recovery of the CMP would cause irreparable harm.  BP Care attached an

affidavit by Roger King, President and sole shareholder of Regal Care Residences, Inc.  Mr.

King asserts that if the Secretary recover the CMP from current Medicare and Medicaid

payments, BP Care "will be forced to cut necessary operating expenses by laying off personnel,"

including RNs, LPNs, STNAs, housekeeping staff and dietary personnel.  Pet. Mot. for Stay, Ex.

(2nd King Aff.) at 1.  In addition, Mr. King claims that the facility would also fail to pay its

vendors in a timely manner to the extent that the vendors would start requiring payment on

delivery.  <u>Id.</u> at 1-2.  Ultimately, Mr. King claims that the recovery of the CMP would negatively

---

[2](...continued)
administrative proceedings, the Secretary has also requested that the Sixth Circuit affirm this
Court's ruling that such claims fail to state a claim upon which relief may be granted.

N:\_ECF Workload\JHoltzman\BPDefRepStay.wpd

impact the care received by the facility's residents.  Id.  However, although Mr. King implies

that the facility has no financial resources to cover the CMP, he provides no specific financial

information about the provider's current assets, cash on hand, or ability to borrow funds.

**B.      BP Care's Financial Condition**

As of the date of this response brief, BP Care has not yet filed its Medicare and Medicaid

cost reports for the period from January 1, 2003 through December 31, 2003.  However, the most

recent financial data submitted by BP Care to Medicare between May 1, 2001 and December 31,

2002 indicates that BP Care has the financial resources to pay the CMP without cutting services

to the residents.  In order to better understand BP Care's financial situation, a discussion of the

corporate evolution of BP Care is also in order.  In the last three years, three separate, related

corporations have held BP Care's Medicare provider agreement:  BP Care, Inc., RCR North,

Inc., and Regal Care Residences, Inc.  Roger King owned all three corporations.[3]

In July 1999, BP Care, Inc. acquired the nursing home known as Barbara Parke Care

Center.  HHS Ex. 2, at 2-3.  On April 19, 2000, BP Care registered a new trade name:  "the

Residence at Kensington Place."  Id. at 6-7.  Although the corporate structure has changed twice

thereafter, it continued to operate under this name.  Pet. Mot. for Stay, Ex. (1st King Aff.), at 1.

On March 6, 2001, counsel for BP Care executed articles of incorporation for RCR

North, Inc.  Id. at 10-11.  Effective May 1, 2001, BP Care, Inc. and another corporation,

Hamilton Care, Inc., merged out of existence into RCR North, Inc.  Id. at 12-19.  Roger King

signed the Certificate of Merger on behalf of all three corporations.  Id. at 19.  As the surviving

---

[3] See Pet. Mot. for Stay, Ex. (1st King Aff.), at ¶¶ 1-2 (identifying Mr. King as "sole
shareholder" of Regal Care Residences, noting a series of statutory mergers with "related
corporations," and stating that "[b]ecause of the identity of ownership and the subsequent
mergers, references to Regal Care can be used interchangeably.").

N:\_ECF Workload\JHoltzman\BPDefRepStay.wpd

corporation, RCR North, Inc. took on the rights and liabilities of BP Care, Inc.; it also accepted automatic assignment of the Medicare provider agreement.  See Ohio Stat. § 1701.82(A)(3)-(4); 42 C.F.R. 489.18(c).

BP Care (as RCR North, Inc. d/b/a the Residences at Kensington Place) filed a Medicare cost report for the period from May 1, 2001 through December 31, 2001.  During this eight month period, BP Care obtained total revenues of $4,896,061.11 and a net income of $403,977.01.  HHS Ex. 1, at 3 ¶ 9.  As of December 31, 2001, BP Care had total assets in the amount of $1,368,240.74, which included $438,760.49 in cash in its general bank account.  Id. at 3 ¶ 10.  BP Care further stated retained earnings of $328,652.35, and it reported "partnership drawings" of $173,794.00.  Id. at 3 ¶¶ 11-12.  "Retained earnings" refers to the provider's accumulated net earnings from its inception, while "partnership drawings" reflect the withdrawal of assets by the owner and thereby a reduction in the retained earnings.  Id.

On July 29, 2002, counsel for BP Care executed articles of incorporation for Regal Care Residences, Inc.  HHS Ex. 2, at 21-22.  Effective October 1, 2002, RCR North, Inc. and two other related corporations, RCR East, Inc., and RCR Central, Inc., merged out of existence into Regal Care Residences.  Id. at 23-33.  As with the prior merger, Roger King signed the certificate of merger on behalf of all four corporations.  Id. at 33.  Through this second statutory merger, Regal Care Residences, Inc. inherited the rights and liabilities of its corporate predecessors, BP Care, Inc. and RCR North, Inc.  Regal Care Residences, Inc. also accepted automatic assignment of the Medicare provider agreement.

Due to this second change of ownership in September 2002, BP Care filed two cost reports for 2002.  First, BP Care (as RCR North, Inc. d/b/a the Residence at Kensington Place) filed a Medicare cost report for the period from January 1, 2002 through September 30, 2002.

N:\_ECF Workload\JHoltzman\BPDefRepStay.wpd

During this initial nine month period, BP Care received total revenues of $5,392,584.62 and a

net income of $388,164.27.  HHS Ex. 1, at 3 ¶ 13.  As of September 30, 2002, BP Care reported

total assets in the amount of $1,236,683.23, including both $540,974.04 in cash in its general

bank account and a $210,224.54 increase in the reported value of its leasehold improvements.

Id. at 3-4 ¶ 14.  As of September 30, 2002, BP Care's retained earning had also risen to

$732,629.36, and "partnership drawings" increased by $500,000.00 to $673,794.00.  Id. at 4

¶ 15.  The substantial increase in partnership drawings appears to reflect the owner's withdrawal

of a total of $500,000 in assets from BP Care during the nine months prior to the second merger.

Id.

Second, BP Care (as Regal Care Residences d/b/a the Residence at Kensington Place)

filed a Medicare cost report for the period from October 1, 2002 through December 31, 2002.

During the prior two cost report periods, BP Care had reported a net income each time, as well as

increases in total assets, cash accounts, and retained earnings.  However, for the three month

period after the second merger, BP Care stated a net loss.  Specifically, BP Care reported a total

revenue of $1,675,915.07, total expenses of $2,060,219.30, and a resulting net loss of

$384,304.23.  HHS Ex. 2, at 4 ¶ 16.  Nonetheless, as of December 31, 2002, BP Care's assets

total assets equaled $1,249,557.56, including $557,893.45 in cash in its general bank account.

Id. at 4 ¶ 17. As of that date, BP Care also reported retained earnings of $926,807.44 and a

reduced figure for partnership drawings of $500,000.00.  Id. at 4 ¶ 18.  The reduction in

partnership drawings may indicate that the owner returned $173,794.00 (directly or by adjusting

other accounts) to BP Care during this three month period.  Id.

In light of the shift in the provider's reported net income/loss, Joseph Oberman, a CMS

accountant, reviewed BP Care's financial information and performed some additional analysis.

N:\_ECF Workload\JHoltzman\BPDefRepStay.wpd

Id.  Mr. Oberman calculated the average monthly revenues and average monthly expenses for

the first nine months of 2002 and for the last three months of that year, and he compared the

resulting figures.  Id. at 5 ¶¶ 20-21.  Although BP Care's average monthly revenues were

approximately $40,537.71 per month lower during the last three months of 2002, Mr. Oberman

concluded that the significant change in BP Care's net income/loss arose predominantly from a

dramatic increase in BP Care's reported expenses.  Id. at 5 ¶ 22.  The average monthly expenses

for the last three months of 2002 were $130,693.06 per month higher than the average monthly

expense rate for the prior nine months.  Id.  In his declaration, Mr. Oberman states:

> In particular, I noted a sharp rise in the average monthly rates for expenses
> classified as "Consulting and Management Fees – Direct Care" and various
> categories of "Home Office Costs."[4]  During the first nine month period, the
> average monthly rate for all of these costs in the aggregate was $29,459.45.
> However, during the last three month period, the average monthly rate for these
> costs in the aggregate amounted to $87,302.87 – an increase of 296.3%

Id. at 5 ¶ 23.  Nonetheless, viewing the year 2002 as a whole, Mr. Oberman observed that

BP Care still netted a small income overall, not a loss.  Id. at 5 ¶ 24.

Ultimately, as of December 31, 2002, BP Care had assets of $1,249,557.56, which

included $557,893 in cash and a net equity of $42,503.21.[5]  Id. at 5 ¶ 25.  With respect to the

facility's ability to pay the CMP without needing to use funds needed for residents' care,

Mr. Oberman concluded:

> In my professional opinion, given the equity and cash balances indicated by the
> most recent financial statements available to me and the Provider's ability to
> make substantial distributions to the owner through the "partnership drawings"

---

[4] "Home Office Costs" refer to centralized cost centers for the six providers operated by Regal Care Residences, Inc. in 2002, of which the Residence at Kensington Place was only one.

[5] The net equity was calculated by deducting the net loss of $384,304.23 for the last three months of 2002 from the trial balance worksheet's entry for "total equity"of $426,807.44.  Id.

N:\_ECF Workload\JHoltzman\BPDefRepStay.wpd

account, the Provider could pay the $35,650 CMP and the accrued interest
without needing to cut direct care staff or curtail services to its residents.

HHS Ex. 1, at 6 ¶ 26.

## II.    Statement of Law.

BP Care has moved for injunctive relief under Rule 62(c) ("Injunction Pending Appeal"),

which states in pertinent part:

> When an appeal is taken from an interlocutory or final judgment granting,
> dissolving, or denying an injunction, the court in its discretion may suspend,
> modify, restore or grant in injunction during the pendency of the appeal upon
> such terms as to bond or otherwise as it considers proper for the security of the
> rights of the adverse party. . . .

Fed. R. Civ. P. 62(c).  In reviewing a Rule 62(c) motion, this Court considers the same four

factors that are traditionally considered in evaluating a motion for a preliminary injunction:

> (1) whether the stay applicant has made a strong showing that he is likely to
> succeed on the merits; (2) whether the applicant will be irreparably injured absent
> a stay; (3) whether issuance of the stay will substantially injure the other parties
> interested in the stay; and (4) where the public interest lies.

Hilton v. Braunskill, 481 U.S. 770, 776 (1987); see Michigan Coalition of Radioactive Material

Users, Inc. v. Griepentrog, 945 F.2d 150, 153 (6th Cir. 1991). "The movant must address each

factor, regardless of its relative strength, providing specific facts and affidavits supporting

assertions that these factors exist."  Griepentrog, 945 F.2d at 154.  "These factors are not

prerequisites that must be met, but are interrelated considerations that must be balanced

together."  Id at 153.

## III.    Argument.

Without either introducing any legal arguments that would create serious questions about

this Court's decision or disclosing any specific details about its current financial status, BP Care

once again attempts to postpone collection of the CMP.  BP Care and its owner and sole

- 9 -

shareholder, Roger King, flatly assert that it will be "forced" to pay the CMP with funds

otherwise earmarked for residents' care, and thereby allegedly cause BP Care's residents

irreparable harm. Pet. Mot. for Stay, at 5; Id., Ex. (2nd King Aff.) at 1 ¶ 2. However, the most

current cost report information submitted to Medicare belies the assertion that BP Care would be

"forced" to pay the CMP, directly or indirectly, at the residents' expense. A nursing home

should not be permitted to use its residents as a means of thwarting the very survey and

certification enforcement process that Congress intended to protect those residents. Therefore,

the Secretary requests that this Court deny BP Care's motion.

      **A.**      **BP Care Has Not Made a Strong Showing of Likelihood of Success on the Merits.**

      In focusing on "irreparable harm," BP Care emphasizes the proposition that the Court

may accord the likelihood of success on appeal less weight if the party seeking the stay makes a

stronger showing of irreparable harm. Pet. Mot. for Stay, at 4, 7 (citing, e.g., Nwakanma v.

Ashcroft, 352 F.3d 235, 327-28 (6th Cir. 2003)). Nonetheless, according "less weight" to

likelihood of success does not mean dispensing with this element altogether. "[E]ven if a

movant demonstrates irreparable harm that decidedly outweighs any potential harm to the

defendant if a stay is granted, he is still required to show, at a minimum, 'serious questions going

to the merits.'" Griepentrog, 945 F.2d at 153-54 (citation omitted).

      BP Care fails to demonstrate any serious questions going to the merits of this Court's

decision to dismiss the case. Although asserting that it "respectfully disagrees" with the Court's

decision, BP Care fails to add any significant points that might cast doubt upon this Court's

decision. Instead, BP Care simply reiterates its theory that it could not participate in the

administrative proceedings because it "was never issued a due process notice that it could join

N:\_ECF Workload\JHoltzman\BPDefRepStay.wpd

the appeal or file its own appeal." Pet. Mot. for Stay, at 7. However, this Court correctly found

that BP Care had actual notice of the proceedings. Moreover, BP Care has yet to produce any

corroboration in precedent or law for its novel theory that the ALJ was precluded from asserting

jurisdiction over the new owner because CMS did not issue a second, separate notice of

imposition of remedies to that new owner. To the extent that BP Care, which claims it was

"never a part of the administrative appeal," may contend that the Secretary's regulations contain

no express means for any participation in the proceedings at all, BP Care is simply incorrect.

42 C.F.R. §§ 498.49 & 498.60(a) (permitting non-parties to participate in the administrative

proceedings if the ALJ deems it necessary or appropriate); Pet. Mot. for Stay, at 7. BP Care also

makes no attempt to controvert this Court's Rule 12(b)(6) dismissal in deference to Deerbrook

Pavilion, L.L.C. v. Shalala, 235 F.3d 1100, 1103-05 (8th Cir. 2000). BP Care's Rule 62(c)

motion should be denied for failing to raise any serious questions regarding this Court's ruling.

**B.    BP Care Has Not Credibly Demonstrated That It Would Suffer Irreparable Harm If This Court Denies Its Request For A Stay**.

The mainstay of BP Care's motion is its dubious assertion of irreparable harm. In

evaluating the issue of irreparable harm, this Court will "generally look to three factors: (1) the

substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of

the proof provided." Griepentrog, 945 F.2d at 154. In particular, the key term for consideration

is "irreparable." Id. "Mere injuries, however substantial in terms of money, time and energy

necessarily expended in the absence of the stay, are not enough." Id.

Preliminarily, the nature of the alleged "irreparable harm" to BP Care deserves close

inspection. BP Care would lose some revenue, but this is not enough to constitute irreparable

harm. Likewise, to the extent that BP Care alleges that recovery of the CMP would cause

N:\_ECF Workload\JHoltzman\BPDefRepStay.wpd

"strains" between the facility and its vendors, this assertion does not meet the requisite standard for relief. "Monetary or economic harm by themselves do not constitute irreparable harm." Montgomery v. Carr, 848 F. Supp. 770, 775 (S.D. Ohio 1993). Ultimately, BP Care's allegations do not pertain to harm to BP Care itself, but rather to the alleged harm that BP Care would cause to its residents and staff by paying the CMP out of funds intended for resident care.

To obtain injunctive relief, the harm alleged must "be both certain and immediate, rather than speculative or theoretical." Griepentrog, 945 F.2d at 154; see id. ("In order to substantiate a claim that irreparable injury is likely to occur, a movant must provide some evidence that the harm has occurred in the past and is likely to occur again."). As explained above, BP Care's most recent Medicare cost report submissions do not indicate that BP Care would be "forced" to pay the CMP with funds reserved for patient care. During the nine months prior to the second corporate merger (effective September 30, 2002), BP Care's owner withdrew a total of $500,000.00 in assets. HHS Ex. 1, at 4 ¶ 15. During the three months after this merger, BP Care also reported a sharp increase in its expenses relating to "Home Office" items and "management and consulting fees" by 296.3%. Id. at 5 ¶ 23. Even in spite of it all, BP Care still ended 2002 with assets of $1,249,557.56, including $557,893 in cash and a net equity of $42,503.21. HHS Ex. 1, at 5-6 ¶¶ 23-26. There is nothing in BP Care's financial history to suggest that payment of a debt of $40,748.62 would cause the extensive harm alleged by BP Care.[6] In requesting injunctive relief, BP Care also fails to address the availability of other possible means of raising funds to pay the CMP, such as through the use of loans.

---

[6] Indeed, the history of BP Care's "partnership drawings" suggests that during the last three months of 2002, when BP Care reported a net loss, its owner actually returned a substantial sum of withdrawn assets to the facility. See id. at 1 ¶ 18.

N:\_ECF Workload\JHoltzman\BPDefRepStay.wpd

BP Care's evidence in support of its allegations of harm is inadequate. BP Care provides no financial analysis of the facility's specific current net income/loss, cash on hand, assets or equity. Instead, BP Care's owner, Mr. King, simply asserts that recovery of the CMP would mandate laying off staff. Indeed, Mr. King states that BP Care would lay off RNs, LPNs, STNAs, houskeeping staff and dietary personnel. Pet. Mot. for Stay, Ex (2nd King Aff.) at 1 ¶¶ 3-4. In addition to these layoffs, Mr. King further asserts that BP Care would also be unable to pay its vendors in a timely manner. Id. at 2 ¶ 6. However, as of February 10, 2004, the total debt due was only $40,748.62. The Secretary submits that it is simply not credible to assert that five separate categories of employees would have to be laid off to counteract a drop in revenue of that size, and even less likely that the resulting savings generated by such wide-ranging layoffs would still not be sufficient to keep BP Care from failing to pay its bills on time. The very magnitude of the alleged harm in the absence of hard financial data sharply undercuts its credibility. The alleged harm is neither certain, nor immediate in this case.

**C.    BP Care Incorrectly Assesses the Potential Injury to Other Parties.**

BP Care claims that the Secretary would incur no potential harm in staying collection of the CMP because the Secretary is financially secure and will continue to be so due to a future stream of Medicare and Medicaid payments to the provider. In making this assertion, BP Care fails to take into account the Secretary's long-standing interest in protecting the integrity of the survey and certification enforcement process. See R15, Ex. 8, at 12 (stating in CMS's January 9, 2000 motion for reconsideration of the ALJ's order of dismissal that CMS imposed the CMP "to ensure prompt compliance with program requirements"); R15, Ex.10, at 9 (denying solely pecuniary purpose for CMP).

N:\_ECF Workload\JHoltzman\BPDefRepStay.wpd

Moreover, in asserting that the Secretary's potential recovery is financially secure to the extent that this Court should not even require BP Care to post a bond, Pet. Mot. for Stay, at 6, the Secretary questions the validity of BP Care's assumptions.[7]  Although the Secretary acknowledges that at the moment there is a flow of Medicare and Medicaid payments to the facility against which the Secretary could recover, unusual activities in BP Care's financial history counsel hesitation in relying on that assumption in the long-term.  First, BP Care has avoided payment for almost two years (if not more).  Second, for unknown reasons, BP Care has undergone two mergers with related corporations owned by Roger King, and it appears that prior to the last merger in 2002, $500,000.00 in assets was withdrawn from the corporation.  Third, the cost report for the last three months of 2002 revealed an unusual 296.3% increase in "Home Office" costs and consulting and management fees after the merger between two companies wholly owned by Roger King.  See HHS Ex. 1, at 5 ¶ 23.  In light of these considerations, the Secretary is reasonably concerned about the potential for further withdrawals of BP Care's assets and the possibility of further corporate transactions that might impair his ability to recover.

### D.    The Public Interest Lies In Denying the Stay.

The Secretary strongly disagrees with BP Care's assessment of the public interest. Although the Secretary agrees that conserving Medicare and Medicaid funds are an important consideration for the public fisc, the greatest public interest lies in the integrity of the survey and certification process created by Congress.  In preserving his authority to effectuate remedies in a timely and efficient manner, the Secretary protects and serves Medicare and Medicaid

---

[7]  BP Care's suggestion that the Secretary's proof of claim in the bankruptcy proceedings would afford a measure of financial protection during a stay is particularly unpersuasive in light of BP Care's own admission in the Complaint that "there are insufficient assets of Barbara Parke in the Bankruptcy Case by which to pay any CMP."  R1 at 8 ¶ 35, J.A. at 13.

N:\_ECF Workload\JHoltzman\BPDefRepStay.wpd

beneficiaries, and thereby also serves their families, friends and the public at large.  Ultimately,

BP Care claims that the public interest lies in staying collection because payment of the CMP

would cause BP Care to harm the residents.  However, the likelihood of such alleged harm

speculative and poorly substantiated at best.  The Secretary submits that the public interest lies in

preventing a provider such as BP Care from attempting to use the beneficiaries as a means of

thwarting the regulatory enforcement scheme created for their protection.

**IV.    Conclusion.**

For the reasons set forth above, the Secretary respectfully requests that the Court deny

BP Care's motion for an injunction pending appeal.

Respectfully submitted,

GREGORY G. LOCKHART
United States Attorney

Dated: <u>March 2, 2004</u>

<u>s/ Jan M. Holtzman</u>
JAN M. HOLTZMAN (0017949)
Assistant United States Attorney
221 East Fourth Street
Suite 400
Cincinnati, Ohio 45202
(513) 684-3711

Of counsel:

Alex M. Azar II
General Counsel
Donna Morros Weinstein
Chief Counsel, Region V
James Walsh
Assistant Regional Counsel
U.S. Department of Health and Human Services
Office of the General Counsel, Region V
233 N. Michigan Ave., Suite 700
Chicago, IL 60601

N:\_ECF Workload\JHoltzman\BPDefRepStay.wpd

CERTIFICATE OF SERVICE

It is hereby certified that a copy of the foregoing **SECRETARY'S RESPONSE TO MOTION FOR STAY OF EXECUTION PENDING APPEAL** was sent electronically on this 2nd  day of March, 2004, to  Stanley Goodman, Esq.,  and  Geoffrey E. Webster, Esq.

          s/ Jan M. Holtzman

          JAN M. HOLTZMAN
          Assistant U.S. Attorney

N:\_ECF Workload\JHoltzman\BPDefRepStay.wpd